ROBRENO, District Judge,
concurring:
I agree that Castillo cannot establish deficient performance' or prejudice for his counsel’s failure to move to suppress the fruits of the search or dismiss the indictment because the search of his house was not constitutionally infirm. Castillo had a diminished expectation of privacy as a participant in the pretrial interventioh (“PTI”) program, and Officer Kurtz had reasonable suspicion to search the premises.
I write separately, however, to. draw a limiting principle around the majority’s .extension of the Court’s decision in United States v. Carter, 566 F.3d 970 (11th Cir. 2009) (per curiam), to a PTI participant, because Carter addressed only whether the warrantless search of a probationer’s home was .reasonable.. The majority equates Castillo to the probationer in Carter because Castillo agreed to conditions that allowed home visits from an officer. The majority also references the Supreme Court’s recognition that parolees and probationers convicted of crimes are more likely to offend, and the majority concludes that this logic applies equally to individuals admitted, to a PTLprogram.
While I agree that Castillo’s participation in the PTI program reduced his expectation of privacy, I disagree that it did so to the extent and degree that the expectation of privacy is réduced for probationers and parolees. Similarly, I disagree that the government’s interest in monitoring PTI participants is necessarily as high as its interest in monitoring probationers and parolees. The Supreme Court in United States v. Knights, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), contemplated a balancing test, not a litmus test.
*1307 “[T]he ultimate touchstone of the Fourth Amendment is ‘reasonableness.’ ” Brigham City v. Stuart, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). Eeasonableness is defined “in objective terms by examining the totality of the circumstances.” Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). In considering the circumstances of a particular search, the court balances “the degree to which it intrudes upon an individual’s privacy” and “the degree to which it is needed for the promotion of legitimate governmental interests.” Knights, 534 U.S. at 119, 122 S.Ct. 587 (quoting Wyoming v. Houghton, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)). Both sides of the scale are important because the more reduced the individual's privacy interest, the less interest the government must show in order to intrude upon the individual’s privacy.
First, as to Castillo’s privacy interests, privacy rights under the Fourth Amendment exist on a continuum. On one end of the continuum sit prisoners whose privacy interests are extinguished by judgments placing them in custody. Hudson v. Palmer, 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (explaining that “the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell”). On the opposite end of the continuum sits the general population, consisting of individuals who have never been convicted of a felony. See, e.g., Green v. Berge, 354 F.3d 675, 679-81 (7th Cir.2004) (Easterbróok, J., concurring) (discussing “at least four major categories” of persons with privacy interests “potentially subject to differing legal analysis”).
The Supreme Court has recognized that differing degrees of privacy interests lie between the two margins. For example, in Knights, the Court held that a-police officer’s warrantless search of a probationer’s home was reasonable. 534 U.S. at 118, 122 S.Ct. 587. The Court found the defendant’s probationary status “salient” and observed that- “[probation is- ‘one point ... on a- continuum of possible punishments ranging from solitary- confinement -in a maximum-security facility to a few hours of mandatory community service.’” Id. at 119, 122 S.Ct. 587 (quoting Griffin v. Wisconsin, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)). Importantly, the' probationer’s placement on the continuum of possible punishments corresponded to the. probationer’s placement on the continuum of-privacy rights, as the Court recognized that probationers “do not enjoy ‘the absolute liberty to which every citizen is entitled.’” Id. (quoting Griffin, 483 U.S. at 874, 107 S.Ct. 3164). Because the search in Knights was. supported by reasonable-suspicion and authorized by- a clear, condition of the defendant’s probation, the ■ warrantless search of' his apartment was reasonable. Id, at 122,. 122 S.Ct. 587.
The Supreme Court later made clear that “[o]n this continuum, parolees have fewer expectations of - privacy than probationers, because. parole is more akin to imprisonment than probation is to imprisonment.” Samson v. California, 547 U.S. 843, 850, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). The Court concluded in Samson that a parolee “did -not have an expectation of privacy that society would recognize as legitimate.” Id. at 852, 126 S.Ct. 2193. After “[examining the totality of-the circumstances pertaining to petitioner’s status as a parolee, ‘an established variation on imprisonment,’- including.. the plain terms of the parole search condition,”- the Court held that the suspicionless search of the parolee did not violate the Fourth Amendment. Id. at 857, 126 S.Ct. 2193 (quoting Morrissey v. Brewer, 408 U.S. 471, 477, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)).
*1308 Neither the Supreme Court nor this Court - has previously addressed the reasonableness of a search in the context of a pretrial intervention program. And given the Supreme Court’s distinction between the privacy rights of probationers and parolees in Samson, I am compelled to note a distinction between the .scope and extent of the privacy rights of a probationer or parolee and a PTI participant. On the continuum of privacy rights, a PTI participant sits somewhere between the general public and a probationer.
As an offender -without a serious criminal history, Castillo entered into the PTI Agreement with the Palm Beach County State Attorney’s Office. To enter the PTI Agreement, Castillo admitted to burglary and dealing in stolen property by use of the internet, but he did not plead guilty to those crimes in a court of law. In exchange for the state’s promise not to prosecute, Castillo agreed that a PTI officer “may visit [Castillo’s] home, employment, school, or elsewhere without [Castillo’s] prior approval and comply with all instructions he or she might give [Castillo].”
Unlike the conditions of probation at issue -in Knights, Castillo’s PTI conditions were not “a form of criminal sanction” akin to incarceration that were “imposed by a court 'upon an offender after verdict, finding, or plea of guilty.” Knights, 534 U.S. at 119, 122 S.Ct. 587 (quoting Griffin, 483 U.S. at 874, 107 S.Ct. 3164). In contrast to probation or parole, the PTI program is not court imposed or subject to judicial review. State v. Board, 565 So.2d 880, 881 (Fla.Dist.Ct.App.1990) (“A court can no more compel the state to reinstate a defendant’s pretrial intervention status than it can compel the state to place the defendant on pretrial intervention in the first place.”). Rather, the PTI program is a creation of Florida law that grants the state attorney the right to make a final determination as to whether the prosecution will continue, Fla. Stat. § 948.08(5) (2013), and the Florida Supreme Court has recognized that admission to the PTI program is within the state attorney’s sole discretion. Cleveland v. State, 417 So.2d 653, 654 (Fla.1982) (“The pretrial intervention program is merely an alternative to prosecution arid should remain in the prosecutor’s discretion.”).
Additionally, a PTI participant waives important rights, such as the right to speedy trial. Fla. Stat. § 948.08(2). But the waiver of these rights is not “punishment[ ] for criminal convictions,” Knights, 534 U.S. at 119, 122 S.Ct. 587, because the PTI participant has not been convicted at all. If the participant does not satisfy the program’s requirements, the program administrator can merely recommend that the case “revert to the normal channels of prosecution,” “the offender is in need of further supervision,” or the “dismissal of charges without prejudice ... be entered.” Fla. Stat. § 948.08(5)(a)-(c). The PTI Agreement is “essentially a conditional decision not to prosecute [for a certain period of time] similar to the nolle prosequi situation.” Cleveland, 417 So.2d at 654. This entire PTI Agreement is forrried and implemented without judicial oversight.
Although I agree that a PTI participant has a diminished expectation of privacy compared to the general public, the PTI participant cannot be considered commensurate with a probationer or parolee on the continuum of Fourth Amendment privacy rights in light of these patent differences.
Second, on the other side of the Knights balancing test, the government’s. interest in monitoring PTI participants is not as demonstrably strong as the government’s interest in monitoring probationers or parolees. In Knights and Samson, the Court determined that the government has an “overwhelming interest” in monitoring probationers and parolees, which warrants *1309 “privacy intrusions that would not otherwise be tolerated under the Fourth Amendment.” Samson, 547 U.S. at 853, 126 S.Ct. 2193.
Specifically, the Court in Knights credited “the very assumption of the institution of probation” that a probationer is “more likely than the ordinary citizen to violate the law.” Knights, 534 U.S. at 119-21, 122 S.Ct. 587 (quoting Griffin, 483 U.S. at 880, 107 S.Ct. 3164). Likewise, in Samson, the Court considered the government’s interest to be “substantial” in “reducing recidivism and thereby promoting reintegration and positive citizenship” for parolees. Samson, 547 U.S. at 853, 126 S.Ct. 2193. In both cases, the government validated these assumptions and established its interest in regulating individuals who had been previously convicted of crimes by relying on recognized statistical rates concerning recidivism. See id. (discussing several statistical studies that indicate a parolee’s higher propensity to offend); Knights, 534 U.S. at 120, 122 S.Ct. 587 (examining studies by the U.S. Department of Justice, Bureau of Justice Statistics and concluding that the recidivism rate of probationers is significantly higher than the general crime rate).
Fol|owing Knights, this court in Carter stated that the government’s interest in preventing a probationer from committing further crimes was “high.” 566 F.3d at 974. It cited Knights for the proposition that “the government’s interest in monitoring a probationer stems from a probationer’s propensity to commit more crimes, as well as a probationer’s motivation to hide the evidence of his crimes.” Id. The court pointed out that, unlike the defendant in Knights, the defendant in Carter “was on probation for both a violent felony and a drug-related felony.” Id. (emphasis in original). As such, the court concluded that “where the probationer has a. history of drug and violence-related felonies, the government’s interest in monitoring the probationer is particularly high.” Id.
Although the propensity of a PTI participant to offend may exceed that of the general public, it is unclear on this record whether that possible propensity is .identical to the verified proclivity of probationers that was presented in Knights or of parolees that was presented in Samson. Participation in the PTI program is available to only a “first offender” or “person previously convicted of not more than one nonviolent misdemeanor.” Fla. Stat. § 948.08(2). As a PTI participant without a serious criminal history, Castillo stands in contrast to the Carter probationer, whose history of drug and violence-related felonies shaped the government’s “particularly high” interest. Therefore, the government does not necessarily have the same substantial interest in monitoring a PTI participant like Castillo as it does in monitoring probationers, and parolees.
Without equating Castillo to a probationer or parolee, I nevertheless conclude that the particular circumstances surrounding Castillo’s situation do “not sway the Knights balancing test such that [Officer Kurtz] needed more than reasonable suspicion to conduct a search.” United States v. Yuknavich, 419 F.3d 1302, 1311 (11th Cir.2005). Reasonable suspicion consists of “a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual’s privacy interest reasonable.”. Knights, 534 U.S. at 121, 122 S.Ct. 587. “When making a determination of reasonable suspicion, [this court] must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.” Yuknavich, 419 F.3d at 1311 (quoting United States v. Perkins, 348 F.3d 965, 970 (11th Cir.2003)). *1310 Here, before conducting the search, Officer Kurtz received information that Castillo had an assault rifle and made specific threats to identifiable individuals. It is this information, combined with Castillo’s participation in the PTI program—and not his participation in the PTI program alone—that created reasonable and sufficiently particularized suspicion" to justify the search of Castillo’s house. I therefore concur in the result reached by the majority. -